## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **IVY TESTING SERVICE, INC.** | § | **PLAINTIFF** |
| | § | |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:23cv168-HSO-BWR** |
| | § | |
| | § | |
| **S&S COMMERCIAL, INC.** | § | |
| **and DEBRA J. SILLIMAN** | § | **DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT DEBRA J. SILLIMAN'S MOTION [27] TO DISMISS

BEFORE THE COURT is Defendant Debra J. Silliman's Motion [27] to Dismiss all claims brought against her by Plaintiff Ivy Testing Service, Inc. for failure to state a claim upon which relief can be granted. After due consideration of the Motion [27], the parties' submissions, and relevant legal authority, the Court finds that the Motion [27] should be granted, and that Plaintiff Ivy Testing Service, Inc.'s claims against Defendant Debra J. Silliman should be dismissed with prejudice.

## I.  BACKGROUND

### A.  Factual background

On or about June 23, 2022, Plaintiff Ivy Testing Service, Inc. ("Plaintiff" or "Ivy Testing") entered into a subcontract with Defendant S&S Commercial, Inc. ("S&S Commercial"), who is not a party to this Motion [27], for "drilling services at the NASA, Stennis Space Center." Mem. [34] at 2. Plaintiff had completed

approximately forty percent of the work under the subcontract when S&S Commercial was terminated by the prime contractor, Civil Works Contracting, LLC ("CWC"). Am. Compl. [25] at 2. Plaintiff invoiced S&S Commercial for a total of $522,806.24, "per the parties' Subcontract, agreement, and at S&S Commercial's discretion[,]" of which $348,915.04 remains unpaid. *Id.* Plaintiff claims that "[d]espite demand, S&S Commercial has failed and refused to pay Ivy Testing the Project balance due of $348,915.04." *Id.* at 3. Plaintiff has filed suit against both Defendants seeking to recover $348,915.04. *Id.* at 3-5.

Of relevance to the present Motion [27], the Amended Complaint [25] alleges that Defendant Debra J. Silliman ("Silliman"), S&S Commercial's President, "acting in her personal capacity, promised to pay the debt owed to Ivy Testing[,]" *id.* at 3, and that "[d]espite personally guaranteeing payment to Ivy Testing, Silliman has failed and refused to pay Ivy Testing[,]" *id.* Plaintiff supports this claim with three emails Silliman sent to Plaintiff[1] or its counsel before suit was filed, while the parties were attempting to resolve the outstanding balance. *See id.*; Ex. [25-4]; Ex. [25-5]; Ex. [25-6]. The question presented in the Motion [27] to Dismiss is whether Plaintiff can hold Silliman personally liable for S&S Commercial's outstanding debt based upon these emails. *See generally* Mem. [28]; Mem. [34].

The first email was sent by Silliman on March 15, 2023. *See* Ex. [25-4]. In it, Silliman offered a settlement of $160,188.88 to resolve S&S Commercial's debt to

---

[1] Two of the emails were sent to Ronnie Ivy, *see* Ex. [25-4] at 1; Ex. [25-6] at 3, also known as Angie Ivy, who was listed as Plaintiff's president on its subcontract with S&S Commercial, *see* Ex. [25-1] at 2.

Plaintiff, and Silliman broke down what she believed S&S Commercial owed into four items. *Id.* at 1-2. For example, her email stated that the outstanding balance on "Item #1" was:

> Total of all Drills performed and billed:          $303,367.00
> Total Paid to Date:                                          ($173,891.20)
> Balance Due On this Item:                            $129,465.80
> S&S Commercial, Inc [sic] guarantees payment of this balance without question. CWC still owes me money on this and we are confident we will be paid on this from CWC even if we have to make a bond claim on it. Understand I am planning to pay you even if I do not get paid from CWC in a settlement and I will chase the bond company myself on this.

*Id.* at 1 ("($173,891.20)" appears in red in the original email). Regarding "Item #2['s]" outstanding balance of $24,000.00 and "Item #3['s]" outstanding balance of $6,713.08, Silliman stated that "S&S Commercial, Inc [sic] will guarantee payment on th[ese] item[s]." *Id.*

As for "Item #4[,]" Silliman did not believe that she would be able to collect from CWC on "Downtime" charges for labor and equipment, which totaled $134,104.30, *id.* at 1-2, and these charges were not included in her settlement offer. Silliman requested that Plaintiff advise her of what must be paid for Plaintiff "to be satisfied on [the] downtime charges." *Id.* at 1-2. She concluded with "S&S Commercial, Inc [sic] will pay [Plaintiff] a total of $160,188.88[,]" and that "[i]f I get settled with CWC and they agree to pay me I will pay you out as soon as I get paid on that settlement from CWC." *Id.* at 2.

Plaintiff responded with a request that S&S Commercial pay $265,500.00. Ex. [25-6] at 3. The same day, Silliman requested a copy of all invoices that showed a "detailed breakdown of what [Plaintiff is] charging on each of these items." *Id.*

3

Silliman followed up on March 24, 2023, reiterating her need for a breakdown of the invoices, stating that she "cannot go to Stennis or CWC with a lump sum invoice under any circumstances." *Id.* Silliman's email also stated in relevant part that:

> I hope you can understand that I am looking at agreeing to paying [sic] an astronomical amount of money that I am not being paid and have no guarantee of ever being paid any of it.
>
> . . .
>
> So the overall picture is this:
>
> I am paying out a total of $230,023.00 out of my pocket above the original contract amount for the drills that have been performed. That amount does not even include the 10% retainer that is being held.
>
> I have paid out more money to you guys than I have collected from CWC on the drills that were performed.
>
> SO as you can see, I figured my settlement offer to the maximum amount that I felt like I could afford to pay above what I have been paid.

*Id.* at 1-2.

On April 4, 2023, Plaintiff's counsel emailed Silliman seeking an update, to which Silliman responded:

> I had sent a correspondence on March 24, 2023 to Mr [sic] Ronnie pertaining to our being able to reach an agreement among ourselves so we could have the attorney's [sic] draw up the agreement for finalization. I had made an offer that I thought was really fair of what I could take upon myself to pay out of my pocket to clear him out and he sent back a counter offer [sic] that was above what I can handle. I have discussed the issue with my attorney and have confirmed the information sent to Mr [sic] Ronnie that details what I owe contractually and what I was willing to take on myself in order to try to get Mr [sic] Ronnie taken care of.

Ex. [25-5] at 1. Silliman then recounted the earlier email exchanges, stating that she had requested a detailed breakdown of what was owed and never received a

4

reply. *Id.* Silliman reiterated that she needed this detailed breakdown before she could go to CWC, the prime contractor, to seek payment. *Id.* Silliman further stated that despite the fact S&S Commercial had paid Plaintiff more than it had received from CWC, CWC was attempting to use the failure to pay Plaintiff as a reason to terminate S&S Commercial for cause. *Id.* Silliman claimed that she explained these circumstances to "Mr. Ronnie" and suggested Plaintiff's counsel converse with his client and get in touch with Silliman's attorney once the two "are on the same page." *Id.*

B.   Procedural history

Plaintiff filed the instant action on June 6, 2023, in the Circuit Court of Hancock County, Mississippi. State Court Documents [1-1] at 1. Plaintiff brought claims for breach of contract and quantum meruit against Defendants S&S Commercial and Silliman (collectively "Defendants") for failure to pay the outstanding project balance. *Id.* at 6-7. Defendants removed the case to this Court on July 12, 2023, *see* Not. [1], and Silliman filed a Motion [4] to Dismiss, *see* Mot. [4].

Plaintiff filed an Amended Complaint [25] on October 12, 2023, bringing no new claims, *see* Am. Compl. [25], but in light of the Amended Complaint [25] the Court denied Silliman's Motion [4] to Dismiss without prejudice, Text Only Order, October 13, 2023. The Amended Complaint [25] advances claims for breach of contract (Count I) and quantum meruit (Count II) against S&S Commercial and Silliman. Am. Compl. [25] at 3-6. In its Amended Complaint [25], Plaintiff added a

statement of jurisdiction, and alleged new facts concerning Plaintiff's work under the subcontract and the approval of the subcontract by CWC. *Compare id.* at 1-3, *with* State Court Documents [1-1] at 5-6. Silliman has now renewed her Motion [27] to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), *see* Mot. [27], and Plaintiff has not sought leave to further amend its pleadings.

C.   Silliman's Motion [27] to Dismiss

1.   Silliman's Motion [27]

Silliman argues that the Amended Complaint [25] fails to allege that she personally entered into a contract with Plaintiff guaranteeing the obligations of S&S Commercial because Plaintiff failed to plead any mutual assent or that any alleged agreement satisfies Mississippi's statute of frauds. Mem. [28] at 5-12. Silliman argues the emails attached to the Amended Complaint [25] demonstrate the lack of a meeting of the minds as to any personal guaranty, noting that in the April 4, 2023, email, she stated that she made an offer and Plaintiff made a counteroffer. *Id.* at 7.

Silliman next asserts that the alleged contract between her and Plaintiff would constitute a suretyship agreement, which under Mississippi law must be in writing, *id.* at 9 (citing Miss. Code Ann. § 15-3-1(a)(1)), and that no signature showing "intent of the party at issue to be bound[,]" appears in the email, *id.* at 12 (emphasis omitted). This is because the emails and signature block on them reflect that Silliman was acting in a representative capacity, and when a writing is signed in such a capacity, "it is only enforceable against the represented party and not the

6

person signing in their individual capacity." *Id.* at 12 (emphasis omitted) (citing *Lambert Cmty. Hous. Grp., L.P. v. Wenzel*, 987 So. 2d 468, 473 (Miss. Ct. App. 2008)). Thus, Plaintiff's alleged agreement is with S&S Commercial and not Silliman. *Id.*

Lastly, Silliman contends that Plaintiff "has not alleged sufficient facts to pierce the corporate veil and hold Silliman liable for the contracts entered into by S & S Commercial." *Id.* at 13 (emphasis omitted). She maintains that the Amended Complaint [25] and the subcontract "clearly demonstrate Ivy Testing knew at all times it was entering into a contract with S & S Commercial" and that Plaintiff "has made no plausible allegation that Silliman or S & S Commercial failed to abide by corporate formalities." *Id.* at 14-16.

2.   <u>Plaintiff's Response [33]</u>

Plaintiff responds that a contract with Silliman was formed because she made an oral promise to pay Plaintiff from personal funds in return for Plaintiff not pursuing legal claims against S&S Commercial. Mem. [34] at 7-8. In Plaintiff's view, the emails attached to the Amended Complaint [25] do not evidence the lack of an agreement as Silliman claims, but instead "merely evidence the earlier oral agreement Silliman entered with Ivy Testing, and Silliman's desire to renege on that agreement by attempting to renegotiate the amount due Ivy Testing." *Id.* at 9-10.

As to Silliman's statute of frauds argument, Plaintiff acknowledges that it is attempting to hold Silliman liable for an oral promise, but maintains that the

statute of frauds is inapplicable because Plaintiff never "alleged, nor plead, that Silliman's personal contract was for a special promise to answer for the debt of another." *Id.* at 9 (citing Miss. Code Ann. § 15-3-1(a)(1)). Plaintiff posits that its contract with Silliman was not a suretyship agreement because it was made after the subcontract between Plaintiff and S&S Commercial was formed, nor was it a guaranty because it "did not make Silliman secondarily liable nor rely on the breach of the prior written subcontract because S&S Commercial had already breached the written subcontract by failing to pay Ivy Testing for several months." *Id.* at 9.

As to piercing the corporate veil, Plaintiff clarifies that "at this time, Ivy Testing has not alleged, nor plead, that it is attempting to pierce the corporate veil of S&S Commercial and seek personal liability from S&S Commercial's shareholders." *Id.* at 10. To the extent a response is required on the issue, Plaintiff asserts that after discovery, "the facts may bear out to show that Silliman can be held personally liable through a corporate veil piercing claim." *Id.*

3.    Silliman's Reply [37]

In her Reply [37], Silliman argues that Plaintiff "cannot point this Honorable Court to any allegation made in the First Amended Complaint, or attached documents, where it accepted any offer made by Silliman." Reply [37] at 6. Silliman notes that her March 15, 2023, email was a settlement offer, and Plaintiff responded with a counteroffer, in which it requested "that S & S Commercial, and notably not Silliman, pay it $265,500.00." *Id.* at 5 (citing Ex. [25-6]). Silliman contends that her March 24, 2023, email evidences a rejection of the counteroffer,

and her April 4, 2023, email reflects "the failed attempts to reach an agreement with Ivy Testing . . . ." *Id.* (citing Exs. [25-5], [25-6]). Silliman disputes Plaintiff's claim that she made an oral promise by highlighting that this is "a new allegation that is in neither the First Amended Complaint nor the emails attached." *Id.* at 6.

As to her statute of frauds argument, Silliman highlights that Plaintiff admits it is attempting to hold Silliman liable for an oral promise, and she posits that it is "inconsequential that Ivy Testing did not use the exact phrase 'special promise to answer for the debt of another'" in its Amended Complaint [25] because "[t]he facts alleged by Ivy Testing clearly demonstrate Ivy Testing's desire to hold Silliman personally liable for the amounts it is allegedly owed by S & S Commercial." *Id.* at 7. Silliman argues that under Mississippi law, "when the surety obligation is collateral – meaning that the original debt remains enforceable – then any verbal surety agreement is invalid under the statute of frauds." *Id.* at 9 (citations omitted). Lastly, Silliman points out that since Plaintiff has conceded that it did not make a claim for piercing the corporate veil, any such claim should be dismissed, as any facts Plaintiff claims might exist were not alleged in the Amended Complaint [25]. *Id.* at 10.

## II.   DISCUSSION

### A.   Relevant legal standards

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (quotation omitted); *see also*

*Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016). A claim

does not need detailed factual allegations, but must provide "more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not

do." *Twombly*, 550 U.S. at 555. While a court must accept all well-pleaded facts as

true and view those facts in the light most favorable to the claimant, *Varela v.

Gonzales,* 773 F.3d 704, 707 (5th Cir. 2014) (citations omitted), a claimant must

plead "factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678 (citing

*Twombly*, 550 U.S. at 556).

In resolving a Rule 12(b)(6) motion to dismiss, a court "will not look beyond

the face of the pleadings to determine whether relief should be granted based on the

alleged facts." *United States ex rel. Jamison v. Del-Jen, Inc.*, 747 F. App'x 216, 219

(5th Cir. 2018). But a court "may rely on the complaint, its proper attachments,

'documents incorporated into the complaint by reference, and matters of which a

court may take judicial notice.'" *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d

757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338

(5th Cir. 2008)). "[I]t is not error to consider the exhibits [to a complaint] to be part

of the complaint for purposes of a Rule 12(b)(6) motion." *United States ex rel. Riley

v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 375 (5th Cir. 2004). Furthermore, if "an

allegation is contradicted by the contents of an exhibit attached to the pleading,

then indeed the exhibit and not the allegation controls." *Id.* at 377 (citing *Simmons*

*v. Peavy–Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940)); *see Carter v. Target Corp.*, 541 F. App'x 413, 417 (5th Cir. 2013).

The Court has jurisdiction over this matter pursuant to diversity of citizenship under 28 U.S.C. § 1332. "Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Thus, in resolving the present Motion, the Court applies Mississippi substantive law.

B.    Analysis

1.    The Amended Complaint [25] does not plead sufficient facts to allege a contract was formed with Silliman

In Mississippi, the elements of an enforceable contract are[:] "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Hattiesburg Health & Rehab Center, LLC v. Brown*, 176 So. 3d 17, 21 (Miss. 2015) (quotation omitted).

Silliman claims there was no mutual assent sufficient to form a contract. *See generally* Mem. [28]; Mem. [34]; Reply [37]. "A meeting of the minds, or '[t]he manifestation of mutual assent[,] . . . ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party.'" *Thompson v. White*, 328 So. 3d 210, 216 (Miss. Ct. App. 2021) (alteration in original) (quoting Restatement (Second) of Contracts § 22 (Am. Law Inst. 1981)). "In the context of negotiations conducted by written 'correspondence, one party must make a

proposition and the other accept the same as made; in other words, the minds of the parties must meet upon a definite proposition,' and the terms must be identical." *Id.* (quoting *Morris v. Liberty Mut. Ins. Co.*, 659 F. Supp. 201, 204 (N.D. Miss. 1987)). Thus, "[w]hen the response to the offer is a proposal that changes the terms of the offer, it is a counter-offer and serves as a rejection." *Id.* (citing Restatement (Second) of Contracts § 39 (Am. Law Inst. 1981)). Under basic contract principles, a "rejected offer cannot constitute an enforceable promise[,]" and "[w]hen an offer has been rejected, it ceases to exist." *Id.* at 217 (quoting *Mooneyham v. Progressive Gulf Ins. Co.*, 910 So. 2d 1223, 1226 (Miss. Ct. App. 2005)).

Plaintiff argues that mutual assent exists because Silliman made an oral promise, however, other than what is contained in the emails, it does not point to any facts pled in the Amended Complaint [25] alleging that such a promise occurred, or the circumstances surrounding the making of such a promise. *See* Mem. [34] at 5-8. The only factual allegations against Silliman in the Amended Complaint [25] are:

> 11. Due to S&S Commercial's continued failure to pay Ivy Testing the Project balance, Silliman, S&S Commercial's President, acting in her personal capacity, promised to pay the debt owed to Ivy Testing. *See*, Silliman's March 15, 2023, E-mail to Ivy Testing attached as Exhibit "D," Silliman's April 4, 2023, E-mail to Ivy Testing's counsel attached as Exhibit "E," and Silliman's March 24, 2023, email to Ivy Testing attached as Exhibit "F."

> 12. Despite personally guaranteeing payment to Ivy Testing, Silliman has failed and refused to pay Ivy Testing.

Am. Compl. [25] at 3. Plaintiff's allegations regarding the promise by Silliman are clearly tied to the emails attached to and cited in the Amended Complaint [25], and

the Amended Complaint [25] otherwise lacks the "factual content that allows the court to draw the reasonable inference that the defendant is liable for" a separate oral contract, *see Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Nor has Plaintiff pointed to any additional factual allegation in the Amended Complaint [25], beyond those in the emails, that would support a reasonable inference that a meeting of the minds occurred; the Amended Complaint [25] generally cites the emails as evidence of an agreement without pointing to any other facts to show the parties reached an agreement. *See generally* Mem. [34].

A review of the emails reflects that no meeting of the minds occurred, such that the element of mutual assent is lacking. *See generally* Ex. [25-4]; Ex. [25-5]; Ex. [25-6]. The emails show Silliman made an offer on March 15, 2023, *see* Ex. [25-4] at 1-2, which was rejected via the counteroffer made by Plaintiff in its March 22, 2023, email, *see* Ex. [25-6] at 3. In the March 15, 2023, email, Silliman proposed a settlement of $160,188.88 to cover all of the outstanding debts owed to Plaintiff except for the "downtime" charges. Ex. [25-4] at 2. Plaintiff responded in its March 22, 2023, email that "Ivy has agreed on the following payment" of $265,500.00. Ex. [25-6] at 3. Plaintiff's email was thus a counteroffer, and for purposes of contract formation under Mississippi law, the offer made by Silliman on March 15, 2023, whether on behalf of S&S Commercial or herself, was rejected and "cease[d] to exist." *Thompson*, 328 So. 3d at 217 (quoting *Mooneyham*, 910 So. 2d at 1226). Plaintiff cannot now use this email to show that Silliman contracted to be liable for S&S Commercial's debt.

13

Nor do Silliman's March 22, 24, and April 4, 2023, emails evidence a meeting of the minds. *See* Ex. [25-6] at 1-3. Silliman's March 22, 2023, email merely requests a breakdown of the "Downtime Charges" Plaintiff sought. *Id.* She sent a follow-up email on March 24, 2023, again requesting a breakdown of the "Downtime Charges[.]" *Id.* at 1-2. Silliman also fully explained her view of the ongoing negotiations and her trouble with getting paid by CWC, saying that "I figured my settlement offer to the maximum amount that I felt like I could afford to pay above what I have been paid." *Id.* Nowhere in these emails did Silliman make any kind of statement or give any indication that there was already an agreement or that she was accepting Plaintiff's counteroffer. *See id.*

In her April 4, 2023, reply to Plaintiff's counsel, Silliman highlights that the parties' attorneys needed to "draw up the agreement for finalization" and that "she had made an offer . . . and [Plaintiff] sent back a counter offer [sic] that was above what I can handle." Ex. [25-5] at 1. Silliman reiterated her problem with CWC, and informed Plaintiff's counsel she "d[id] not feel right about sending anything to [Plaintiff's counsel] that [Plaintiff] has not sent to [him]." *Id.* Silliman informed Plaintiff's counsel that once he had "a feel" for his client's position, he should reach out to her attorney. *Id.* Again, nowhere in this email is there any indication that a meeting of the minds occurred, and when the content of this email is viewed in the context of the other emails, it is apparent no such agreement was reached. *See id.*

Overall, these emails evidence the parties' failure to reach a meeting of the minds. *See* Ex. [25-4] at 1-2; Ex. [25-5] at 1; Ex. [25-6] at 1-3. In addition, price must

be stated with specificity in order for a contract to be formed under Mississippi law, which the emails reflect was not the case here. *See Rotenberry v. Hooker*, 864 So. 2d 266, 270 (Miss. 2003) ("The contract fails when the price has not been stated with specificity." (citing *Leach v. Tingle*, 586 So. 2d 799, 803 (Miss. 1991))). The lack of mutual assent was further reflected when Silliman responded to Plaintiff's counsel's request for an update, where she referred to Plaintiff's email as a counteroffer, above what she could afford, and stated that the attorneys needed to draw up any agreement for finalization. *See* Ex. [25-5] at 1. These statements are further indications of a lack of mutual assent and that the terms, including price, were still to be negotiated. *See id.* In sum, the emails directly contradict the Amended Complaint's [25] conclusory assertions that a promise by Silliman was made, and the Court need not treat Plaintiff's conclusory allegation that mutual assent existed as true. *See United States ex rel. Riley*, 355 F.3d at 377 (citing *Simmons*, 113 F.2d at 813); *Carter*, 541 F. App'x at 417.

Even if the emails supported a plausible inference that some form of acceptance occurred, this does not mean that Plaintiff could bind Silliman personally as Silliman was plainly negotiating in a representative capacity. Throughout her March 16, 2023, email, she consistently stated that "S & S Commercial, Inc [sic] guarantees payment . . . ." Ex. [25-4] at 1-2. Silliman's emails were sent from an "@sscommercialinc.org" domain name, and the signature block contained her title, "S & S Commercial, Inc." and "http://sscommercialinc.org/[.]" Ex. [25-4] at 2; Ex. [25-5] at 2. Silliman discusses how she was paying "above the

15

original contract amount" between Plaintiff and S&S Commercial, and the issues she was having with obtaining payment from CWC for the general contract between it and S&S Commercial. *See* Ex. [25-5] at 1; Ex. [25-6] at 1-2. She also uses the terms "we" and "I" interchangeably, indicating that she was not speaking on behalf of herself alone. *See* Ex. [25-4] at 1-2; Ex. [25-5] at 1; Ex. [25-6] at 1-2. In sum, the attached exhibits reflect that Silliman was communicating on behalf of S&S Commercial, and they do not support a plausible inference that Silliman was contracting to be personally bound. *See Nguyen v. Regions Bank*, No. 1:10CV253-HSO-JMR, 2010 WL 5071173, at *4 (S.D. Miss. Dec. 7, 2010) (collecting cases) ("Under Mississippi law, the general rule is that an agent for a disclosed principal incurs no liability for a breach of duty or a contract perpetrated by its disclosed principal and a third party.").

In sum, the Court cannot reasonably treat the Amended Complaint's [25] conclusory allegation that Silliman individually contracted to pay S&S Commercial's debt as true when such allegation is directly contradicted by the attached exhibits. *See United States ex rel. Riley*, 355 F.3d at 377 (citing *Simmons*, 113 F.2d at 813); *Carter*, 541 F. App'x at 417. Nor has Plaintiff pointed to any factual details alleged elsewhere in the Amended Complaint [25] that permit the Court to draw a reasonable inference that an agreement was formed between Plaintiff and Silliman personally. Silliman's Motion [27] to Dismiss should be granted.

2.      Plaintiff's claim against Silliman is barred by the Mississippi statute of frauds

Even if an oral promise existed as Plaintiff claims, it would be barred by Mississippi's statute of frauds. "As a general rule, Mississippi law does not require that contracts be made in writing. . . . [O]ral contracts are ordinarily no less enforceable than others." *Putt v. City of Corinth*, 579 So. 2d 534, 538 (Miss. 1991). However, Mississippi's statute of frauds serves as an affirmative defense to the enforcement of certain oral contracts, requiring that certain contracts be in writing.[2] *See* Miss. Code Ann. § 15-3-1. Under Mississippi's statute of frauds, five categories of contracts are unenforceable unless they are in writing; of relevance here, one of those categories is "any special promise to answer for the debt or default or miscarriage of another person[.]"*Id.*; *see also, e.g.*, *In re Est. of Fitzner*, 881 So. 2d 164, 172-73 (Miss. 2003); *Patton Med. of Gulf Coast, Inc. v. Relle*, 269 So. 3d 266, 280-81 (Miss. App. 2018); *McLane Services, Inc. v. Alstom Power, Inc.*, No.

---

[2] While Plaintiff fails to raise this issue, the Court notes that a statute of frauds defense usually cannot serve as the basis for a Rule 12(b)(6) dismissal. *Pub. Health Equip. & Supply Co., Inc. v. Clarke Mosquito Control Products, Inc.*, 410 F. App'x 738, 741 (5th Cir. 2010) (per curiam) ("The law does not require that plaintiffs plead affirmatively that a contract is written." (citing *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, N.A.*, 467 F.3d 466, 470 (5th Cir. 2006))). However, "where a defendant has a valid, affirmative defense made plain on the face of the pleadings, the district court may dismiss on this basis." *Guajardo v. JP Morgan Chase Bank, N.A.*, 605 F. App'x 240, 249 (5th Cir. 2015) (per curiam) (citing *Kansa Reinsurance Co., Ltd. v. Cong. Mortg. Corp. of Texas*, 20 F.3d 1362, 1366 (5th Cir. 1994)). In *Clarke Mosquito Control Products, Inc.*, the Fifth Circuit held that the statute of frauds was inapplicable at the pleading stage because the district court incorrectly found that an oral agreement existed based solely on defendant's motion to dismiss. *Clarke Mosquito Control Products, Inc.*, 410 F. App'x at 741 ("In order for an agreement to violate the statute of frauds on the face of the complaint, the plaintiff must indicate that the agreement is not written."). But that is not the case here, as the Court's ruling is based upon Plaintiff's, not Defendant's, assertion that the Amended Complaint [25] seeks to enforce an oral promise. *See* Mem. [34] at 2, 5, 7, 9.

3:04-cv-974-TSL-JCS, 2006 WL 1547364, at *3-4 (S.D. Miss. June 5, 2006). Plaintiff acknowledges that it is attempting to enforce an oral contract, *see* Mem. [34] at 2, 5, 7, 9, thus, the question becomes whether the purported oral contract Plaintiff seeks to enforce against Silliman is in fact a "special promise to answer for the debt or default or miscarriage of another person[,]" such that it had to be in writing, Miss. Code Ann. § 15-3-1.

The statute of frauds "contemplates situations between parties wherein a gratuitous promise by a third party is made to pay a creditor for the debts of another." *Hall v. Dillard*, 739 So. 2d 383, 388 (Miss. Ct. App. 1999) (holding such a situation existed when a plaintiff sought to hold a business owner personally liable for money the business owed to plaintiff). Thus, a plaintiff is prohibited from bringing "any action seeking to charge an individual with the obligation of answering the debt of another, unless in such circumstances the promise or agreement be reduced to writing and signed by the parties to be charged therewith." *Id.* at 389. "In considering a party's promise to pay the debt of another, '[t]he question to be kept in mind always is whether or not the person making the promise is entering into an original or a collateral obligation.'" *Alstom Power, Inc.*, 2006 WL 1547364, at *3 (quoting *Allen v. Smith & Brand*, 133 So. 599, 601 (Miss. 1931)). "If the promise is an original obligation," such that the "the liability of the debtor is extinguished[,]" then the promise need not be in writing. *Id.* (quotation omitted). However, if after a third party promises to answer for the debt of another, the

18

original debtor remains liable, the agreement is collateral and falls within the statute of frauds. *Id.* (citing *Sweatman v. Parker*, 49 Miss. 19, 27-28 (Miss. 1873)).

For example, in *Alstom Power, Inc.*, the defendant hired on a construction project to manufacture two boilers hired a subcontractor to install the refractory system in the boilers. *Id.* at *1. The subcontractor then hired plaintiff to assist with installing the refractory system, but failed to pay the plaintiff the approximately $800,000.00 it owed for work on the project. *Id.* The defendant terminated the subcontractor and approached the plaintiff about completing the refractory installation, making an oral promise to pay a $700,000.00 advance. *Id.* The plaintiff treated the payment as a promise to cover the subcontractor's outstanding debt, and filed suit when defendant treated the payment as an advance by applying it against the cost of the remaining work done by the plaintiff on the project. *Id.* The Court found that the promise alleged by plaintiff was a collateral obligation subject to the statute of frauds because the plaintiff still sought payment of the debt from the subcontractor, and granted summary judgment on plaintiff's breach of contract claim. *Id.* at *4.

The same reasoning applies here. It cannot be reasonably disputed that the emails do not constitute a writing within the meaning of the statute of frauds, as Plaintiff argues that Silliman made an oral promise, not a written one. Mem. [34] at 9-10. Instead, Plaintiff argues that the promise Silliman made does not fall within the statute of frauds. *See id.* This question turns upon whether the alleged contract was a collateral or an original obligation. The Amended Complaint [25] seeks to

hold both Silliman and S&S Commercial liable for the amount owed on the project balance. *See* Am. Compl. [25] at 4 (Plaintiff requests that it "be granted a judgment against S&S Commercial, Inc. and/or Debra J. Silliman in at least the amount of $348,915.04"). Plaintiff's breach of contract claim states that "S&S Commercial and Silliman have failed and refused to pay Ivy Testing the outstanding Project balance of $348,915.04 as per the parties' agreement." *Id.* at 3. Thus, the facts as pled reflect that by attempting to hold both Silliman and S&S Commercial liable, Plaintiff is asserting a collateral obligation, which is subject to the statute of frauds. *See Alstom Power, Inc.*, 2006 WL 1547364, at *3-4.

The promise allegedly made by Silliman is similar to one found in *Patton Med. of Gulf Coast, Inc. v. Relle*, where the Mississippi Court of Appeals held that an oral statement could not bind an individual to a corporate debt without some writing. 269 So. 3d at 280-81. In *Relle*, the plaintiff attempted to hold the defendant individually liable for unpaid profits defendant's business owed to plaintiff after a failed joint business venture. *Id.* at 270. In affirming summary judgment in favor of the defendant, the Mississippi Court of Appeals found that deposition testimony that defendant "said that . . . we have his word as a man that this will be taken care of, if not by his company, by him" did not support the plaintiff's claim that the defendant was individually liable, because such a statement was a "special promise to answer for the debt or default or miscarriage of another person" rendering it subject to the statute of frauds. *Id.* (quoting Miss. Code Ann. § 15-3-1(a)). Just as in *Relle*, Plaintiff here is attempting to hold Silliman liable for a corporate debt. *See*

Mem. [34] at 2, 5, 7, 9. By alleging that "Silliman, S&S Commercial's President, acting in her personal capacity, promised to pay the debt owed to Ivy Testing[,]" Am. Compl. [25] at 3, the Amended Complaint [25] alleges a situation "between parties wherein a gratuitous promise by a third party is made to pay a creditor for the debts of another[,]" *Hall*, 739 So. 2d at 388, such that any purported promise by Silliman was collateral and fell within the statute of frauds, *see Relle*, 269 So. 3d at 280-81.

The only possible argument supporting the existence of a writing is the emails themselves, *see* Exs. [25-4], [25-5], [25-6], but Plaintiff has not claimed that these constituted a binding written contract, instead stating that the emails "merely evidence the earlier oral agreement Silliman entered with Ivy Testing, and Silliman's desire to renege on that agreement by attempting to renegotiate the amount due Ivy Testing[,]" Mem. [34] at 9-10.  And any claim that the emails created a written contract would not carry the day because while an email with an electronic signature may satisfy the statute of frauds, Silliman must still intend to be individually bound. *See Par. Transp. LLC v. Jordan Carriers Inc.*, 327 So. 3d 45, 56 (Miss. 2021) (holding that under Mississippi law a signature must show both an intent to authenticate the writing and adopt it). As the Court has previously found, the emails do not reflect that Silliman intended to be bound individually.

In sum, there is no plausible allegation of any specific writing evidencing Silliman's intent to be personally bound for the debt of S&S Commercial, and the statute of frauds bars Plaintiff's claims against Silliman.

3.    Plaintiff has not pled a claim for piercing the corporate veil

By Plaintiff's own admission, the Amended Complaint [25] does not allege a claim for piercing the corporate veil. *See* Mem. [34] ("[A]t this time, Ivy Testing has not alleged, nor plead, that it is attempting to pierce the corporate veil of S&S Commercial and seek personal liability from S&S Commercial's shareholders."); *see also* Am. Compl. [25]. Under Mississippi law, Plaintiff must "make sufficiently particularized allegations demonstrating the applicability of the veil piercing doctrine to the facts of the case." *Nash Plumbing, Inc. v. Shasco Wholesale Supply, Inc.*, 875 So. 2d 1077, 1082 (Miss. 2004) (citing *N. Am. Plastics, Inc. v. Inland Shoe Mfg. Co., Inc.*, 592 F. Supp. 875, 879 (N.D. Miss. 1984)); *see also Canadian Nat. Ry. Co. v. Waltman*, 94 So. 3d 1111, 1116 (Miss. 2012); *Donaldson v. Ovella*, 228 So. 3d 820, 829 (Miss. Ct. App. 2017). Thus, there is no veil-piercing claim in this case and the Court need not address this issue.

4.    Plaintiff's quantum meruit claim against Silliman fails as a matter of law

Finally, Plaintiff's quantum meruit claim in Count II fails as against Silliman for two reasons. First, Plaintiff had an express contract with S&S Commercial, and thus cannot sue Silliman under a theory of implied contract. *Ground Control, LLC v. Capsco Industries, Inc.*, 214 So. 3d 232, 243 (Miss. 2017) ("Because *quantum meruit* is an implied contract theory, available only when there is no express contract, '[w]here there is a contract, parties may not abandon same and resort to *quantum meruit*.'" (emphasis and alteration in original) (citing *Redd v. L & A Contracting Co.*, 151 So. 2d 205, 208 (Miss. 1963))).

Second, to succeed on a quantum meruit theory, Plaintiff must "show that the services were rendered under the reasonable expectation that they would be paid for by the person sought to be charged, and the person sought to be charged knew that the services were being performed with the expectation that [s]he would pay for such work." *Redd*, 151 So. 2d at 209; *see also Ground Control, LLC*, 214 So. 3d at 243 (citing *Redd* to hold the same). As the Court has already explained, the emails attached to the Amended Complaint [25] demonstrate that Silliman was speaking on behalf of S&S Commercial, not herself. *See* Ex. [25-4]; Ex. [25-5]; Ex. [25-6]. Further, the Amended Complaint [25] alleges that Plaintiff expected to be paid by S&S Commercial for the work performed; the contract under which Plaintiff performed the work was with S&S Commercial, not Silliman. Am. Compl. [25] at 2 ("Ivy Testing invoiced S&S Commercial per the parties' Subcontract, agreement, and at S&S Commercial's direction for a total amount of $522,806.24."); *see also Ground Control, LLC*, 214 So. 3d at 243 (reversing a trial court's failure to grant a directed verdict on the plaintiff's quantum meruit claim because the plaintiff performed services with an expectation to be paid by someone other than the defendant). For these reasons, Plaintiff's quantum meruit claim against Silliman should also be dismissed.

## III.  CONCLUSION

To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result. Defendant Debra J. Silliman's Motion [27] to Dismiss should be granted.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendant

Debra J. Silliman's Motion [27] to Dismiss is **GRANTED**, and all claims against

Defendant Debra J. Silliman asserted by Plaintiff Ivy Testing Service, Inc., are

**DISMISSED WITH PREJUDICE**.

**SO ORDERED AND ADJUDGED**, this the 24th day of April, 2024.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE